INAS L. WEVER v. STATE OF NEBRASKA.

FILED OCTOBER 30, 1931. No. 27967.

*William N. Jamieson* and *J. R. Lones,* for plaintiff in error.

*C. A. Sorensen, Attorney General,* and *Clifford L. Rein, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

GOOD, J.

Inas L. Wever, plaintiff in error (hereinafter designated defendant), was convicted on an information charging her with first-degree murder by administering strychnine poison to her husband, George Wever. She brings the record of her conviction to this court for review.

There are numerous assignments of error, but many of them are not discussed in the briefs and are apparently abandoned. We shall consider only those which are dis-

cussed in the briefs and apparently relied upon by defendant.

Defendant complains that the court erred in permitting evidence to be received tending to show frequent quarrels and controversies between defendant and her husband, extending over a period of several years previous to the homicide in question. The record discloses that defendant, as a witness, gave evidence of like tenor, although she did deny some specific incidents related by witnesses for the state. It is a rule that the admission of incompetent evidence is not prejudicial where the same facts are established by the testimony of the complaining party himself, and whether before or subsequent to the admission of the incompetent evidence. 17 C. J. 324.

It is contended that some of the incidents related by state witnesses were too remote and should not have been considered or admitted in evidence. While some of the incidents were somewhat remote, the evidence tends to show that there was a continuous course of conduct between the parties, and that hostilities existed during many years previous to the homicide. It is also a rule that remoteness of such testimony is regarded as affecting the weight and not the admissibility of the evidence, especially when the condition continues to the time of the homicide. 30 C. J. 184, 196-198; *Sharp v. State*, 115 Neb. 737.

Defendant complains because evidence was admitted showing the purchase by her of arsenic on the day before the death of Mr. Wever. The information charged the commission of murder by the administration of both arsenic and strychnine sulphate, but there is no evidence that Mr. Wever's death resulted from arsenical poisoning. At the close of the state's evidence, on motion of the prosecuting attorney, all evidence relating to the purchase of the arsenic was stricken from the record, and the jury were directed to disregard it.

We think the evidence was properly admissible. The defendant testified that the strychnine purchased on the day of Mr. Wever's death was for the purpose of exterminating rats, and the arsenic had been purchased the

day before for the same alleged purpose. Evidently, sufficient time had not elapsed since the purchase of the arsenic on the 8th day of December to determine whether other or different poison was necessary to accomplish that purpose. The purpose for which defendant said she purchased the strychnine might very well be questioned, in view of the very recent purchase of arsenic for the same purpose. With respect to this testimony, no error prejudicial to the defendant was committed in its admission, but, had it been error, the striking thereof from the record and the direction to the jury to disregard it were sufficient to destroy any effect it might have had. This court has held in *McCormick v. State,* 66 Neb. 337, and *Robinson v. State,* 71 Neb. 142, that error in the admission of evidence is cured by withdrawing such evidence and directing the jury to disregard it.

It is contended that defendant was deprived of a fair trial on account of hissing and applauding on the part of spectators in the courtroom during the trial. There is no evidence in the record of any hissing. The only evidence of applause is a notation by the reporter, following a verbal tilt between counsel for defendant and a state witness. The court promptly rebuked such conduct and stated that if it occurred again the courtroom would be cleared. Ordinarily, this would be sufficient, but, aside from that, no objection was raised by defendant; nor is there anything in the record to disclose the nature or extent of the applause, or who was guilty of the misconduct. If counsel for defendant at the time had reason to apprehend or believe that such conduct would prejudice the rights of defendant, they should have then requested the court to declare a mistrial. Instead, they elected to proceed with the trial without objection, and took the chance of a favorable verdict, and now seek to overturn the verdict for causes which they knew and did not object to before the case was submitted to the jury.

In *Kriss v. Union P. R. Co.,* 100 Neb. 801, it was held: "The general rule is that counsel cannot remain quiet and seemingly acquiesce in remarks of opposing counsel in his

argument to the jury, and after verdict obtain a reversal because of matters not objected to at the time." The same rule is applicable to alleged misconduct of spectators. Furthermore, it is a rule that demonstrations on the part of spectators do not constitute ground for a new trial where they are checked promptly and where it appears probable that the jury were not prejudiced thereby. *Debney v. State*, 45 Neb. 856; *Lindsay v. State*, 46 Neb. 177. The evidence discloses nothing from which it could be inferred that defendant was in any wise prejudiced by whatever applause there may have been.

It is rather mildly urged in the brief that the trial court should have instructed on the lesser degrees of homicide; second-degree murder and manslaughter. In the instant case, there is no evidence in the record which would, under any circumstances, justify a verdict for murder in the second degree or manslaughter. Defendant was either guilty of murder in the first degree or not guilty of any offense. In *Davis v. State*, 116 Neb. 90, it was held: "In a prosecution for murder in the first degree committed by administering poison, the court is not required to instruct the jury as to the law applicable to manslaughter or murder in the second degree, where the evidence clearly establishes that the defendant is either guilty of the crime charged or entirely innocent."

The principal ground of complaint, and the one chiefly relied upon for reversal, is the insufficiency of the evidence to sustain the verdict. There is evidence in the record tending to show that for a period of years preceding the homicide defendant and her husband had frequent quarrels and controversies; that when her husband was away from home she telephoned a married man that "the coast was clear," and requested him to come to see her in her home, and that she entertained him until 2 o'clock, or later, in the morning; that defendant, on one occasion, stated to a witness that another married man had secured a divorce from his wife for her, the defendant, and that it was "up to her" to get rid of her husband; that she had stated this man had given her a diamond ring.

There is evidence tending to show that on another occasion she was surreptiously removing her personal property from the home, with a view to separating from her husband. There is ample testimony to show motive, on the part of the defendant, for the commission of the crime charged.

The record discloses, without question, that defendant's husband, George Wever, was employed as a painter in the railroad shops at Plattsmouth; that he worked there for a number of years; that he enjoyed fairly good health and was not laid off on account of ill health during any of this period; that he worked up until Monday noon previous to his death, which occurred on the following Tuesday, shortly after noon. On Monday, the 8th of December, he went to work as usual, although he had complained the evening before of a cramp in his leg. During the forenoon of Monday he became ill and complained of pains in his stomach, and about noon of that day he returned to his home, where he was ill and vomited freely and frequently. Defendant consulted a doctor for her husband and was given a prescription, without the physician calling upon her husband at the time. Mr. Wever continued to be quite ill during Monday afternoon, and that night the doctor was called to the house to treat him. The physician administered morphine hypodermically, and directed that the patient be given soda water, or soda in water. During the night, Mr. Wever continued to be ill and vomited frequently, and drank copiously of water or soda in water. On the following morning he was still quite ill, and the doctor was again called and gave him another hypodermic injection of morphine, and left some tablets to be given, with instructions to continue giving the soda in water. Between 12 and 1 o'clock of the same day Mr. Wever died in convulsions. The symptoms which he displayed were described by witnesses present, and competent experts testified that these symptoms were typical of strychnine poisoning. It also appears that rigor mortis set in very soon after death. Experts testified that this was also characteristic where the person died of strychnine poisoning.

On December 8 Mrs. Wever purchased from a pharmacist an ounce of arsenic, stating that it was for the extermination of rats. On the morning of December 9, while Mr. Wever was very ill, defendant went to another drug store and purchased one-eighth of an ounce of strychnine sulphate, saying that it was for the purpose of killing rats. Defendant testified that her husband directed her so to do. It may be observed that it would be a very unusual thing for one, so ill as Mr. Wever and suffering as he was, to suggest, at such a time, that his wife should leave him and go to a drug store to buy rat poison, especially in view of the fact that they had known the condition with respect to rats infesting the premises for some months previous to this time. It seems somewhat strange also that defendant, having purchased on the day previous arsenic to exterminate the rats, would not have so informed her husband, and told him that it was not necessary at that time to purchase additional poison.

A post mortem examination was held, and the walls of the stomach and part of the liver of deceased were examined, and there was found in the parts examined three and one-half milligrams of strychnine, three milligrams in one-half of the walls of the stomach and one-half milligram in one-fifth of the liver. The testimony indicates that this could only have been carried through the blood stream. Experts testified that, since strychnine was carried through the blood stream, it would be about equally distributed over various parts of the body; that, if the entire walls of the stomach had been taken, there would have been six milligrams therein, and, if all the liver had been taken, there would have been two and one-half milligrams therein, or a total of eight and one-half milligrams in the liver and walls of the stomach; that a conservative estimate would be that there was at least ten times this quantity, to wit, 85 milligrams, in the entire body, which was more than sufficient to cause death.

In our opinion, the evidence is sufficient to establish beyond a doubt that Mr. Wever's death occurred as a result of strychnine poisoning. There is no evidence in the rec-

ord tending to show that Mr. Wever saw the strychnine purchased by defendant or knew where it was placed by her. Defendant testified that she used some of it for rats and placed the bottle containing the remainder on a shelf in the cellar of the house. Mr. Wever was confined to his bed on the second floor. No one testified that he left the second floor of his dwelling on the morning of the 9th of December. If the strychnine was purchased for the extermination of rats, it was certainly a very small quantity for such a purpose. The contents of the bottle, containing the remainder of the strychnine sulphate, was later examined and weighed, and it was found that 15 grains had been taken therefrom. The evidence shows that one to one and a half grains of strychnine is sufficient, when taken internally, to cause the death of a human being, and that, in some instances, death has been known to occur to a person taking less than one-half of a grain. The evidence, both on behalf of the state and the defense, is to the effect that defendant administered to her husband frequent drafts of soda water, or soda in water. There is no evidence to indicate that Mr. Wever could have obtained the strychnine either intentionally or by accident. The evidence tends to negative the possibility of such act. There is no evidence that any person, other than defendant, administered drink or medicine to Mr. Wever. We think the evidence adduced was sufficient to warrant the jury in finding defendant guilty of murder in the first degree.

No error prejudicial to defendant has been found. The judgment is

AFFIRMED.